NOTICE

Decision filed 02/05/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250721-U

NOS. 5-25-0721, 5-25-0722 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* SIANNA S. and SYLVIA S., Minors | ) ) | Appeal from the Circuit Court of |
| (The People of the State of Illinois, | ) ) | Williamson County. |
| Petitioner-Appellee, | ) ) | |
| | ) | Nos. 24-JA-18, 24-JA-45 |
| v. | ) ) | |
| Lawrence M., | ) ) | Honorable Amanda Byassee Gott, |
| Respondent-Appellant). | ) ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices McHaney and Bollinger concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the trial court's orders terminating the respondent's parental rights where the respondent fails to provide any argument or citation to authority in support of his claim that the court's finding of unfitness was "undermined" by certain occurrences; the evidence supports the finding of unfitness; and the trial court applied the correct statutory framework and properly took judicial notice of the fitness proceedings during the best-interest hearing.

¶ 2    The respondent, Lawrence M., appeals orders of the circuit court of Williamson County terminating his parental rights to his two minor children, Sianna S. and Sylvia S.[1] He challenges the trial court's finding of unfitness, arguing that the finding is undermined because (1) the trial

_____

[1]Lawrence filed separate appeals in each of the children's cases. This court ordered his appeals consolidated under the case number for Sianna's case.

1

court granted the State's motion to terminate the obligation of the Department of Children and Family Services (DCFS) to provide reasonable efforts at reunification four months before the State sought to terminate his parental rights; (2) the service plan was allegedly not filed in the younger child's case until December 2024; and (3) due to delays in obtaining DNA testing, his parentage of the younger child was not established. Lawrence also challenges the court's finding that termination of his parental rights was in the best interests of the children, arguing that (1) the court did not apply the correct statutory framework and (2) the court improperly took judicial notice of the testimony presented during the unfitness phase. We affirm the trial court's orders.

¶ 3                              I. BACKGROUND

¶ 4       On April 18, 2024, the State filed a petition for adjudication of wardship for Sianna S., who was born in January 2023. The petition named both Lawrence and the child's mother, Sahara S., as respondents.[2] In it, the State alleged that Sianna was a neglected minor pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2024)) due to being in an environment injurious to her welfare. In support, the petition alleged that (1) there was an indicated report of medical neglect by Sahara in September 2023; (2) Lawrence was the subject of numerous previous indicated reports with DCFS, including inadequate supervision, environmental neglect, medical neglect, and sexual abuse; (3) Lawrence's other biological children were removed from his care in eight prior cases, and he had not corrected the conditions that led to their removal; and (4) Lawrence was seen leaving Sahara's home while the child was present, in violation of two no-contact orders.[3] Finally, the petition alleged that intact services had been tried and failed.

---

[2]Sahara filed separate appeals from the trial court's ruling and is not a party to this appeal.
[3]Lawrence was prohibited from having contact with Sahara in Williamson County case No. 23-CF-330. He was prohibited from having contact with Sianna in a dispositional order entered in Williamson County case No. 23-JA-44.

¶ 5    On the same date, the trial court entered a temporary custody order after holding a shelter care hearing. In addition to placing custody and guardianship of Sianna with DCFS, the order directed Lawrence to submit to DNA testing to establish parentage.

¶ 6    On May 10, 2024, a Williamson County sheriff's deputy attempted to serve Lawrence with a summons. However, the deputy was unable to find Lawrence. The docket in this case contains several entries noting that mail sent to Lawrence was returned to the court with a notation indicating it was unable to be forwarded.

¶ 7    Early in June 2024, Sahara gave birth to her second child, Sylvia. On June 10, 2024, the State filed a petition for adjudication of wardship alleging that Sylvia was neglected by virtue of being in an environment injurious to her welfare. See *id*. The petition named Lawrence and Sahara as respondents, along with another putative father, Daryl June. In it, the State repeated the allegations in the petition for Sianna. In addition, the State alleged that law enforcement and DCFS workers saw Lawrence in Sahara's hospital room when she was hospitalized after giving birth to Sylvia and that Lawrence and Sahara had not corrected the conditions that led to Sianna's removal from their care.

¶ 8    The trial court entered a temporary custody order following a shelter care hearing that day. In it, the court ordered both Lawrence and Daryl June to submit to DNA testing to establish parentage.

¶ 9    On June 17, 2024, the State filed a service plan in Sianna's case. The plan was dated April 21, 2024, and approved May 23, 2024, before Sylvia was born. It revealed that intact family services were initiated in April 2023 after reports that Sianna, then three months old, missed nine medical appointments. It indicated that Sianna required medical follow-up because she was exposed at birth to maternal syphilis. In addition, the plan stated that Lawrence had been charged

3

with the criminal sexual assault of 17-year-old Sahara, and that Sahara did not understand the risk that continued contact with Lawrence posed to herself or Sianna.[4]

¶ 10    The service plan required Sahara to complete a mental health assessment and follow any recommendations, complete a substance abuse assessment and follow any recommendations, complete an integrated assessment, complete parenting classes, sign consents to allow communication between caseworkers and providers, cooperate with DCFS, and comply with court orders. The plan required Lawrence to engage in a sexual perpetrator assessment and follow all recommendations, complete a sex offender assessment and follow all recommendations, complete a substance abuse assessment and follow all recommendations, sign consents to allow communication between caseworkers and providers, complete a parenting assessment, complete an integrated assessment, meet with his caseworker at least monthly, and keep DCFS and his caseworker apprised of any changes in his phone number, address, employment, or household makeup. As of April 2024, Sahara had completed none of her required services. The plan did not indicate whether Lawrence had engaged in any services.

¶ 11    The trial court held an adjudicatory hearing in both children's cases on July 25, 2024. Sahara stipulated to the allegations of the petition. After noting that Lawrence had yet to appear in this case, the court asked if he had been served with a summons. The State indicated that although Lawrence had not yet been served, the state's attorney's office was working with the sheriff's department to find his location and serve him. The court asked Sahara if she thought Lawrence was aware of the case. She replied, "Yes." The guardian *ad litem* (GAL) informed the court that Lawrence was in court earlier that day, but she did not know where he went.

_____

[4]Sahara was born in late September 2005. Thus, she was 17 years old when Sianna was born in January 2023 and 16 years old when Sianna was conceived. In addition, although Sahara was 18 years old when Sylvia was born early in June 2024, she was likely a few weeks shy of her eighteenth birthday when Sylvia was conceived. Lawrence was born in February 1974.

¶ 12    On the same date, the court entered adjudicatory orders, finding both children to be neglected due to being in an environment injurious to their welfare (705 ILCS 405/2-3(1)(b) (West 2024)). In Sianna's case, the court based its finding of neglect on the following facts: (1) her birth was the result of a sex crime committed by Lawrence against Sahara; (2) Lawrence was ordered to have no contact with Sahara in the criminal case against him, but he was found present in the home with Sahara and Sianna; (3) Lawrence's rights to his older children were terminated; and (4) Lawrence was indicated for sexual abuse of at least one of his older children. In Sylvia's case, the court stated that its finding of neglect was based on the following facts: (1) Sylvia was taken into foster care as a newborn baby whose older sibling was taken into foster care before she was born; (2) an older sibling was the subject of an indicated report of sexual abuse by Lawrence; (3) both parents had prior indicated reports; (4) services were offered to both parents in the past without success; and (5) Lawrence's rights to his older children were previously terminated.

¶ 13    A dispositional report was filed with the court in both cases on August 13, 2024. The report indicated that at that time, Lawrence's whereabouts were unknown. The report stated that Lawrence had not been in contact with the agency at all and that Sahara was not cooperative. The report further stated that Sahara failed to confirm scheduled visits with the children, as required. In describing Sahara's interaction with the children during visits, the report noted that she did not demonstrate nurturing toward the children. On the same date, the State filed another service plan with the court in both cases. Attached to the service plan was a certification of diligent search outlining the steps taken to attempt to locate Lawrence.

¶ 14    On August 22, 2024, the trial court held a dispositional hearing at which Lawrence again did not appear. Following the hearing, the court entered dispositional orders making both children wards of the court.

¶ 15    On December 5, 2024, the matter came for the first permanency hearing. Lawrence appeared for the first time. The court began by noting that DNA testing results confirmed that Lawrence was Sianna's father. As such, the court indicated it would enter a parentage order to that effect. The court noted, however, that it was still necessary to determine parentage of Sylvia.

¶ 16    Next, the court stated that it had been presented with a proposed permanency order finding that (1) Sahara made reasonable efforts but did not make reasonable and substantial progress toward the children's return to her care, (2) Lawrence did not make either reasonable efforts or reasonable and substantial progress, and (3) continued placement outside the home was necessary. The proposed order also included a goal of return home within 12 months. The GAL objected to the proposed finding that Sahara made reasonable efforts. In addition, she requested a January setting for a permanency hearing, explaining that she intended to file a motion for early termination of reasonable efforts against Lawrence. The GAL explained, "It's an automatic because of the termination in other cases." The court heard testimony from the caseworker concerning Sahara's efforts, but continued the matter for a permanency hearing in January. The court entered an order establishing parentage of Sianna that day.

¶ 17    On December 9, 2024, the GAL filed a motion for early termination of reasonable efforts, alleging that (1) Lawrence's parental rights to his older children were previously terminated in seven cases, (2) Lawrence failed to appear at both the adjudicatory and dispositional hearings, and (3) both children were doing well in their foster home and were bonded with their foster parents. The motion sought termination of reasonable efforts to reunify the children with Lawrence; it did not address reasonable efforts at reunification with Sahara.

¶ 18    The reset permanency hearing took place on January 23, 2025. The court first considered the pending motion for early termination of reasonable efforts. In support of the motion, the GAL

argued that the applicable statute permitted early termination of reasonable efforts by DCFS in cases where a parent's rights were previously terminated. See 705 ILCS 405/2-13.1(b)(i) (West 2024). She explained that there were eight prior cases involving Lawrence's other children, one of which was closed when the child involved aged out, and seven of which led to the termination of Lawrence's parental rights.

¶ 19    The court asked Amanda Moore, a caseworker supervisor for Lutheran Social Services on behalf of DCFS, what the agency's position was regarding early termination of reasonable efforts. Moore replied, "We haven't taken the case to legal screen, so we can't recommend any goal other than return home." The court next questioned Moore about a decision the agency made not to allow Lawrence any visitation with the children. Moore explained that she made the "critical decision" to deny visitation in light of the nature of the allegations against him in the cases involving his other children. The GAL also addressed the decision to deny Lawrence visitation, emphasizing that DCFS made an indicated finding based on the fact that he conceived a child with Sahara while she was underage. The court granted the motion for early termination of reasonable efforts as to Lawrence with regard to both children, noting that he was "the only parent that was filed against."

¶ 20    Next, the court considered testimony and arguments concerning Sahara's progress and compliance with services. The court found that Sahara made reasonable efforts, noting that it was giving her "the benefit of the doubt" in making this finding. However, the court found that she did not make reasonable and substantial progress. The same day, the court entered permanency orders in each case reflecting these findings and setting a goal of return home within 12 months. The court also entered orders granting the GAL's motion for early termination of reasonable efforts as to Lawrence.

¶ 21    On May 21, 2025, the State filed petitions to terminate parental rights in both cases and an amended petition to terminate parental rights in Sylvia's case.[5] The State alleged that Lawrence was an unfit parent on the following grounds: (1) failure to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) failure to protect the children from conditions in their environment injurious to their welfare (*id.* § 1(D)(g)); (3) failure to make reasonable efforts to correct the conditions which led to the children's removal from his care during any nine-month period following adjudication of neglect (*id.* § 1(D)(m)(i)); and (4) failure to make reasonable progress toward the return of the children during any nine-month period following adjudication of neglect (*id.* § 1(D)(m)(ii)). The petition identified the following two nine-month periods for purposes of both failure to make reasonable efforts and failure to make reasonable progress: July 30, 2024, to March 30, 2025, and September 20, 2024, to May 20, 2025. The State alleged that Sahara was an unfit parent due to: (1) failure to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare (*id.* § 1(D)(b)); (2) failure to protect the children from conditions in their environment injurious to their welfare (*id.* § 1(D)(g)); and (3) failure to make reasonable progress toward the return of the children during any nine-month period following adjudication of neglect, identifying the same nine-month periods at issue in the allegations of unfitness against Lawrence (*id.* § 1(D)(m)(ii)). The petition filed in Sylvia's case also included allegations of unfitness against the other putative father, Daryl June.

---

[5]The amended petition corrected an error in the name of the second putative father. It was otherwise identical to the initial petition.

¶ 22  The trial court held a permanency hearing the following day, May 22, 2025. Lawrence did not appear. The court entered a permanency order that day changing the goal to substitute care pending determination of termination of parental rights.

¶ 23  On July 24, 2025, the matter came for a hearing on the State's petition. The State first called Lawrence as a witness. He testified that he was never given a service plan or offered visitation with the children in this case. He stated, "The only thing they ever talked about was terminating rights." He testified that in prior DCFS cases, he completed his service plans "with honors and in a timely manner." Lawrence acknowledged that he had prior convictions for aggravated battery with a firearm, unlawful use of a weapon, and delivery of a lookalike substance, but he testified that he was last paroled in 2000 and had not committed any crimes since that time. He acknowledged that as of the date of the hearing, he had not taken any steps to establish parentage of Sylvia.

¶ 24  The State presented the testimony of Alison Webb, who served as the family's caseworker since the case was opened in April 2024. When asked about the extent of her contact with Lawrence, Webb testified that she saw him in person at the courthouse when he attended the December 5, 2024, hearing. She testified that she did not provide him with a service plan at that time, explaining that she had no prior contact with him and did not expect to see him at the hearing. When she saw him at the December 2024 hearing, Webb asked for Lawrence's phone number so she could keep in touch with him. She testified that she sent him a text message asking for his address, and he responded by providing an address on Bayer Circle. Webb subsequently attempted to contact Lawrence to schedule DNA testing for Sylvia, both by text message and by going to the address he provided, but her attempts were unsuccessful. Webb believed that Lawrence was living

9

in Carterville, but she did not know where. She was unable to verify that the Bayer Circle address he provided was correct and was unable to find another valid address for him.

¶ 25    Webb testified that Lawrence never engaged in any services or demonstrated any intent to parent the children. She acknowledged that the agency did not allow Lawrence any visitation with the children and that she did not provide him with a service plan at either the December 2024 hearing or the January 2025 hearing. She testified, however, that he was provided with a service plan when there was an intact case for Sianna, and she noted that his required services did not change after the children were taken into foster care.

¶ 26    Webb's supervisor, Amanda Moore, also testified for the State. Most of her testimony focused on Sahara. However, asked whether she had concerns about Lawrence's ability to parent the two children, she explained that there were concerns due to the fact that both children were conceived while Sahara was underage and because the prior DCFS cases against Lawrence included allegations of "a sexual nature."

¶ 27    The State asked the court to take judicial notice of the adjudicatory and dispositional orders entered in this case, the court file in Lawrence's criminal case (23-CF-330), and the permanency reports and service plans filed with the court in this case. Lawrence objected to judicial notice of the service plans, arguing that they contained hearsay and that he never received them. Sahara objected to judicial notice of the permanency reports "to the extent they contain hearsay." The court took judicial notice of the record in 23-CF-330 and its prior orders in this case, but reserved ruling on judicial notice of the permanency reports and service plans. The court took that question and the issue of unfitness under advisement.

¶ 28    On August 1, 2025, the court entered a detailed written order finding both parents unfit. The court first took judicial notice of the permanency reports and service plans. In explaining its

10

decision to do so, the court acknowledged that these documents might contain hearsay, but stated that the court was able to "accurately separate any hearsay issues contained therein from the basis of its ruling." The court also noted that the reports and service plans were available to all parties and that the caseworker was subject to questioning about them during her testimony. The court also took judicial notice of its own prior orders, the criminal case against Lawrence, and the seven previous cases involving the termination of Lawrence's parental rights to his older children.

¶ 29   The court then made the following factual findings: it found that Lawrence did not complete any services, failed to submit to DNA testing to determine whether he was Sylvia's biological father, had no relationship with the children, failed to maintain contact with the agency, and did not participate in the case. The court noted Lawrence's "numerous failures to appear at court and the numerous returned mailings in the court file sent from the clerk because [Lawrence] did not keep his address current with the court or agency." The court further found that despite the existence of no-contact orders, Lawrence and Sahara continued to have a relationship and to be together in the presence of the children before they were taken into foster care. The court found that Sahara failed to recognize the danger Lawrence posed to the children and that she did not complete services even though her service plan "contained fairly minimal services" that she could have "completed in short order."

¶ 30   Finally, the court noted that Sahara was never found to have made reasonable and substantial progress toward the children's return to her care and that Lawrence was never found to have made either reasonable efforts or reasonable and substantial progress. The court concluded by finding both parents unfit on all grounds asserted.

¶ 31   The matter proceeded to a best-interest hearing on September 4, 2025. The children's foster mother, McKenzie Resczenski, testified that both Sianna and Sylvia had been in her care since

11

June 2024. She testified that she wanted to adopt the girls and that the entire family loved them, including her seven- and nine-year-old sons. Resczenski further testified that Sianna and Sylvia frequently saw her extended family, including other children, and had developed bonds with extended family members as well. She noted that the children went to daycare with one of her nephews, so they saw him on a daily basis.

¶ 32 The State's next witness was Stephanie Carter, a Court Appointed Special Advocate (CASA) assigned to the children in July 2024. Carter visited the children in their foster home at least once a month. Based on her observations, she had no concerns about the children remaining in that placement. She testified, "It's a loving family." She described the home as "very comfortable" and "always tidy but it's been lived in." She noted that there were many toys.

¶ 33 The caseworker, Webb, likewise testified concerning her observations of the children in their foster home. She stated that the children were happy there and had a strong bond with their foster family. Webb opined that termination of parental rights was in the children's best interests because they were thriving in their current placement.

¶ 34 On cross-examination, Webb testified that she never observed any interactions between Lawrence and the children. She acknowledged that she did not know what, if any, bond he had with Sianna before she came into foster care at the age of 18 months.

¶ 35 At the State's request, the court took judicial notice of the testimony provided during the fitness hearing. Neither parent objected.

¶ 36 In announcing its ruling from the bench, the court first stated it "considered the applicable statute regarding [best interests], 750 ILCS 405/1-3(4.05) [*sic*]." See 705 ILCS 405/1-3(4.05) (West 2024). The court then found that the children had a bond with their foster parents, foster siblings, and the extended family members of the foster parents; that the children were loved in

12

their foster home; and that they had feelings of attachment, familiarity, and affection with their foster family. The court further found that the children had ties to the community in their current placement, including attending daycare. The court noted that Sylvia had been in foster care her entire life and that Sianna had been in foster care for more than half of her life. The court found that remaining in their foster home would be the least disruptive placement for the children.

¶ 37 The court acknowledged that the decision to deny Lawrence visitation with the children impeded his ability to form a bond with them. The court explained, however, that in light of the reasons the children came into foster care, it was unlikely that any services would have led to a finding that he was "a suitable parent." In support of this conclusion, the court noted that Sahara was underage when the children were conceived, resulting in a felony case pending against Lawrence; that there were multiple indicated reports against him; that he "was never able to be successful in prior service plans"; and that his rights to his other children were terminated. The court concluded that termination of both parents' rights was in the best interests of the children.

¶ 38 The court entered orders terminating the parental rights of Lawrence, Sahara, and any and all unknown fathers. Lawrence filed timely notices of appeal on September 9, 2025.

¶ 39                                                    II. ANALYSIS

¶ 40 Lawrence argues that (1) the trial court's findings of unfitness were undermined by the court's decision to grant the GAL's motion for early termination of reasonable efforts, "uncertainty and delay" surrounding Sylvia's parentage, and an alleged delay in filing a service plan in Sylvia's case; (2) the court did not apply the correct statutory framework in assessing the best interests of the children; and (3) the court improperly took judicial notice of the testimony presented during the unfitness phase at the best-interest hearing. We reject these contentions.

¶ 41                                    A. Unfitness

¶ 42    Termination of parental rights involves a two-step process. First, the State must prove that the respondent parent is unfit by clear and convincing evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 62. If the trial court finds a parent unfit, the proceedings progress to the second step, during which the State must prove by a preponderance of the evidence that termination of parental rights is in the children's best interests. *Id.* ¶ 73.

¶ 43    We give great deference to the trial court's unfitness findings because that court had the opportunity to observe and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). As such, we will reverse a finding of unfitness only if it is against the manifest weight of the evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 63. A decision is against the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 44    Here, as we have discussed, the trial court found Lawrence unfit on four grounds: (1) failure to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) failure to protect the children from an environment injurious to their welfare (*id.* § 1(D)(g)); (3) failure to make reasonable efforts to correct the conditions that led to the children's removal during any nine-month period following the adjudication of neglect or abuse (*id.* § 1(D)(m)(i)); and (4) failure to make reasonable progress toward the return of the children during any nine-month period following the adjudication of neglect or abuse (*id.* § 1(D)(m)(ii)). Because a parent may be found unfit if the State proves any one of the statutory grounds for unfitness by clear and convincing evidence, we will affirm the

14

trial court's decision if the evidence supports its finding as to any of these grounds. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶¶ 63-64.

¶ 45 Lawrence does not address the legal framework for analyzing any of the grounds upon which he was found unfit. Instead, he asserts that the trial court's findings of unfitness were undermined by the order for early termination of reasonable efforts on the part of the agency, the lack of a DNA test confirming Sylvia's parentage, and the alleged "late filing" of a service plan in Sylvia's case. Lawrence acknowledges that none of these factors necessarily preclude a finding of unfitness, but he argues that the trial court's order is flawed because it did not address them. We disagree.

¶ 46 We first note that, although Lawrence asserts that no service plan was filed in Sylvia's case until December 2024, the record belies this claim. Lawrence points to a statement the court made at a status hearing held on June 13, 2024, just days after Sylvia's birth. As Lawrence correctly notes, the court stated at the end of the hearing, "I would note, I don't see any service plan in the court file. That needs to be done." However, as we stated previously, the State filed a family service plan in Sylvia's case on August 13, 2024. That plan was dated June 17, 2024, shortly after the status hearing at issue.

¶ 47 Moreover, Lawrence has not provided us with any explanation or citation to proper authority in support of his conclusory assertion that the court's unfitness findings were undermined by the circumstances he identified. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires an appellant's brief to set forth "the contentions of the appellant and the reasons therefor" along with citations to supporting authority. Failure to comply with these requirements results in forfeiture of an appellant's claims on appeal. *Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 23.

15

¶ 48    We reject Lawrence's challenge to the finding of unfitness for the additional reason that the evidence was sufficient to support the finding of unfitness due to his failure to demonstrate a reasonable degree of interest, concern, or responsibility for the welfare of the children. In considering whether a parent is unfit on this basis, our "focus is on the parent's reasonable efforts more so than the parent's success." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 36. Thus, we must take into account circumstances that made it difficult for the parent to demonstrate the requisite reasonable degree of interest, concern, or responsibility. *Id.* Significantly, however, a parent cannot avoid a finding of unfitness by showing *some* interest, concern, or responsibility; the question is whether the parent's interest, concern, or responsibility is *reasonable*. *In re M.I.*, 2016 IL 120232, ¶ 30. In addition, because the statutory language is disjunctive, any of the three elements may provide a basis for a finding of unfitness standing alone. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 36. That is, a parent may be found unfit for failing to maintain a reasonable degree of interest or concern or responsibility. *Id.*

¶ 49    Here, the court expressly acknowledged the difficulty Lawrence faced in establishing a relationship with the children. However, the evidence showed that Lawrence never attempted to comply with the required services in the intact family service plan, failed to communicate with his caseworker, failed to provide an accurate address to his caseworker or the court, failed to appear at most of the hearings in the case, and did not submit to DNA testing to confirm parentage of Sylvia. This evidence is more than adequate to support the court's finding that Lawrence failed to demonstrate a reasonable degree of interest, concern, or responsibility for the children's welfare. Because we may affirm the trial court's decision if the evidence is sufficient to support a finding of unfitness on any one of the asserted grounds, we may uphold the court's finding on this basis

16

alone and need not address the remaining grounds for unfitness. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 64.

¶ 50                                    B. Best Interests

¶ 51    Once the trial court finds a parent unfit, the focus shifts to the child. *Id.* ¶ 73. During the best interest phase, the parent's interest in maintaining a relationship with the child "must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). In deciding whether termination of parental rights is in a child's best interests, the trial court must consider the following statutory factors: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural, and religious background and ties; (4) the child's sense of attachment; (5) the child's wishes; (6) the child's community ties; (7) the need for permanence and stability and the continuity of the child's relationships with parental figures, siblings, and other family members; (8) the uniqueness of each child and family; (9) the risks inherent in substitute care; and (10) the preferences of the individuals available to provide care. 705 ILCS 405/1-3(4.05) (West 2024).

¶ 52    As with the trial court's unfitness finding, we review its best interest finding to determine whether it is against the manifest weight of the evidence. *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 74. This occurs "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. However, we review *de novo* purely legal questions such as the propriety of taking judicial notice. *In re C.N.*, 196 Ill. 2d 181, 203 (2001).

¶ 53    In challenging the court's best interest determination, Lawrence first contends that the court failed to apply the correct statutory framework. In support of this contention, he points to the statement the court made in announcing its ruling from the bench, noting that it had applied the

17

factors in "750 ILCS 405/1-3(4.05)." As he correctly points out, the applicable statute is actually 705 ILCS 405/1-3(4.05). Lawrence acknowledges that the incorrect citation, standing alone, may not warrant reversal. He argues, however, that "it underscores that the factor-by-factor analysis must actually be done on the record under the correct statute." We reject this contention for three reasons.

¶ 54 First, we do not believe the mere fact that the court reversed two digits while citing a statute during its oral ruling raises questions as to whether the court applied the correct statutory framework. See *In re Alexander R.*, 377 Ill. App. 3d 553, 556-57 (2007) (noting that trial courts are presumed to know and correctly follow the law). Second, considering the court's analysis in its entirety, it is clear that the court applied the correct statute. Although the court did not specifically reference or cite each of the statutory factors, it discussed several of them, including the children's sense of attachment, their ties to their community, and the need for permanence and stability. Third, contrary to Lawrence's contention, the court is only required to consider the statutory best-interest factors; it is not required to expressly refer to each individual factor. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 55 Lawrence next argues that the court erred in taking judicial notice of the testimony elicited during the fitness hearing. We disagree.

¶ 56 As Lawrence correctly contends, the best-interest hearing must be conducted separately from the fitness hearing to ensure the proper focus on the children's best interests. *In re D.M.*, 336 Ill. App. 3d 766, 772 (2002). As such, in making a best interest determination, the court may not "rely *solely* on fitness findings to terminate parental rights." (Emphasis added.) *Id.* This limitation, however, does not preclude consideration of evidence admitted during the fitness stage of the proceedings. Rather, consideration of unfitness evidence is proper where the court connects that

18

evidence to the children's best interests and where the court also considers "evidence beyond the unfitness findings," including evidence related to the foster home. See *id.* at 774.

¶ 57    In addition, the Juvenile Court Act of 1987 expressly provides that trial courts may properly take judicial notice of sworn testimony admitted during prior proceedings involving the same minors where the parties were represented by counsel and where doing so would not result in the admission of hearsay evidence at a hearing where that would otherwise be improper. 705 ILCS 405/2-18(6) (West 2024). At a best-interest hearing, unlike a fitness hearing, the formal rules of evidence are relaxed, and the court may consider all evidence helpful in deciding the question before it. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1070 (2009). Thus, judicial notice of testimony from the fitness hearing is generally proper. Because the court properly considered evidence from the fitness hearing along with additional evidence concerning the children's relationship with their foster family, we find no error.

¶ 58    Finally, we note that in the statement of issues in his brief, Lawrence includes the following issue: "Whether the court's reliance at best-interests on a criminal case reference ***, via judicial notice from the record sheet, was proper in scope and supported by the transcript." However, Lawrence does not refer to this issue in the argument section of his brief, much less provide the reasons for his argument or citations to authority. As such, he has forfeited any argument related to this claim. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 59                                    III. CONCLUSION

¶ 60    For the foregoing reasons, we affirm the trial court's orders terminating Lawrence's parental rights to Sianna and Sylvia.


¶ 61    Affirmed.